**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Christopher Frey, Relator<br><br>v.<br><br>HEALTH MANAGEMENT SYSTEMS, INC.; COTIVITI, INC.; PERFORMANT RECOVERY, INC.; and CGI TECHNOLOGIES AND SOLUTIONS, INC.<br><br>     Defendants | Civil Action No: _____<br><br><br>*JURY TRIAL DEMANDED*<br><br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730** |

**FALSE CLAIMS ACT COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

The United States of America (referred to herein as the "Government"), by and through its *qui tam* Relator Christopher Frey (the "Relator"), alleges:

**PRELIMINARY STATEMENT**

1.      This is a civil action brought on behalf of the Government under the False Claims Act, 31 U.S.C. § 3729 – 3733 (the "False Claims Act" or "FCA") to recover treble damages sustained by and civil penalties and restitution owed to the Government as a result of Health Management Systems, Inc., Cotiviti, Inc., Performant Recovery, Inc. and CGI Technologies and Solutions, Inc. (collectively, the "Defendants")  knowingly collecting and failing to refund to the Government millions of dollars of unearned contingency fees in the Medicaid Recovery Audit Contractor (RAC) program.

FALSE CLAIMS ACT COMPLAINT – Page 1 OF 24
*FILED UNDER SEAL*

2.      Relator began acquiring his knowledge of the Defendants' wrongful practices during his employment with HMS from 2006 to 2013.  During most of his employment with HMS, Relator was a Vice President or Regional Vice President with responsibility for managing HMS's relationships with state Medicaid agency customers in his territories, in connection with HMS's third party reclamation claim business under the Medicaid program. During the course of his employment, Relator became intimately familiar with the inner workings of HMS's various lines of business, including its Medicare RAC business.

3.      Relator also became familiar with various ways in which the Defendants coordinated their activities relating to their Medicare RAC business, thereby establishing Relator's information and belief that not only HMS, but also the other Defendants, have knowingly collected unearned contingency fees from the Government in the Medicare RAC program and knowingly failed to return these unearned contingency fees to the Government, in violation of the False Claims Act.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the Government's claims pursuant to 28 U.S.C. §§ 1331 and 1345.

5.      This Court may exercise personal jurisdiction over Defendants because a substantial part of the acts giving rise to the Government's claims occurred within the State of Texas.

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants transact business in this District and/or have committed violations of the False Claims Act in this District.   In addition, at least one of the Defendants, CGI Technologies and Solutions, Inc., has an office in this District.

FALSE CLAIMS ACT COMPLAINT – Page 2 OF 24
*FILED UNDER SEAL*

## THE PARTIES

7.     Defendant Health Management Systems, Inc. is a New York corporation with its principal place of business in Irving, Texas.  In April 2021, HMS was acquired by Gainwell Technologies, Inc. ("Gainwell").  Gainwell transferred HMS's Medicare RAC business to its affiliate Cotiviti (with both Gainwell and Cotiviti both under the common control of Veritas Capital, a private equity firm based in New York, NY ("Veritas").)

8.     Defendant Cotiviti, Inc. is a Delaware corporation with its principal place of business in Waltham, Massachusetts.

9.     Defendant Performant Recovery, Inc. ("Performant") is a California corporation with its principal place of business in Livermore, California.

10.     Defendant CGI Technologies and Solutions, Inc. ("CGI") is a Delaware corporation with its principal place of business in  Fairfax, Virginia.  CGI is a subsidiary of CGI, Inc. of Montreal, Quebec, Canada.

11.     Relator Christopher Frey is a resident of Texas.

12.     Relator brings this action on behalf of the Government pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 – 3733.

## BACKGROUND – THE MEDICARE FEE-FOR-SERVICE RECOVERY AUDIT PROGRAM

### A.  The Recovery Audit Program Generally.

13.     The U.S. Centers for Medicare & Medicaid Services ("CMS"), a branch of the U.S. Department of Health and Human Services, is the federal government agency that administers the Medicare Fee–for–Services ("FFS") program.  Medicare is the federal government program that pays for medical services and items for the elderly and disabled.

Through a network of contractors, CMS processes more than one billion claims for Medicare coverage each year that are submitted by more than one million providers. Providers that submit claims for Medicare coverage include hospitals, physicians, skilled nursing facilities, labs, ambulance companies, and suppliers of durable medical equipment, prosthetics, orthotics, and medical supplies.

14.     Medicare is funded by payroll taxes and self-employment taxes charged to working Americans, and income taxes on retired Americans' Social Security benefits. These funds supporting Medicare are held in two trust fund accounts held at the U.S. Treasury known as the Medicare Trust Funds.  In 2015 it was projected that at current spending levels, one of these two funds, the Medicare Hospital Insurance Trust Fund, would be bankrupt by 2030.   The Medicare Hospital Trust Fund is a commonly considered a barometer of Medicare's financial health, as it pays for critical Medicare Part A benefits such as inpatient hospital care, skilled nursing facility, hospice, lab tests, surgery, and home health care.  Obviously, the cost of fraud and waste in Medicare directly impacts the tax dollars of hardworking Americans who fund Medicare, as well as the Government's ability to pay for Part A benefits for those who need them.

15.     Because of the great volume of claims submitted to Medicare, CMS must pay the claims before reviewing the relevant medical records. To insure that paid claims were in accordance with Medicare guidelines, CMS uses RACs to identify improper payments and highlight any common billing errors, trends, or other Medicare payment issues.  The Recovery Audit Program is authorized under Section 1893(h) of the Social Security Act, codified at 42 U.S.C. 1395ddd.  After a pilot program frequently referred to as the

FALSE CLAIMS ACT COMPLAINT – Page 4 OF 24
*FILED UNDER SEAL*

"Demonstration Project", CMS competitively awarded contracts in 2008 to four RACs, one for each geographical region of the country:  HealthDataInsights, Inc., which HMS acquired in November 2011, and thereby succeeded to its RAC business; Connolly iHealth Technologies, Inc., which became Cotiviti through a May 2014 merger and name change; Performant; and CGI.  The terms of these contracts ran from 2011 to 2018.  The Recovery Audit Program began in full force in 2011 and has operated continuously through the present time.

16.     In 2018, the contracts were renewed with all of the RACs except for CGI, which elected not to re-bid for its contract.  Cotiviti was awarded with the contract for the region previously handled by CGI, thus giving Cotiviti two of the four regions.  Upon Gainwell's acquisition of HMS in April 2021, Gainwell caused HMS's RAC business to be assigned to its affiliate Cotiviti, thus rendering to Cotiviti control of the RAC activity for three of the four regions of the U.S., amounting to 80% or more of the audited Medicare claims nationwide.

17.     Each RAC's services, and CMS's payment of contingency fees to each RAC, are governed by a Statement of Work promulgated by CMS, and individual contracts between each RAC and CMS, all of which are relatively uniform and incorporate the provisions of the Statement of Work.

18.     Each RAC reviews the Medicare FFS claim payments processed in its region along with the underlying medical records to identify improper payments made by CMS to providers.  Improper payments include both overpayments and underpayments to a provider.

FALSE CLAIMS ACT COMPLAINT – Page 5 OF 24
*FILED UNDER SEAL*

19.     An overpayment or underpayment can occur, for example, when an item or service was improperly coded, or simply the wrong amount was paid for other reasons.  An overpayment also can occur when the item or service is not covered under Medicare, was not medically necessary, lacks proper supporting documentation or was not actually provided.

20.     In the case of identified overpayments, the RAC will deny the paid claim either in full or in part.  A claim should be denied in full when, for example, the item or service was not medically necessary or appropriate for the diagnosis and condition of the beneficiary, lacks proper supporting documentation, or was not actually provided.  In these cases, the overpayment amount is the total paid amount for the item or service in question.

21.     The RAC will determine that a claim should be denied in part when, for example, the submitted service was billed at a level higher than what was reasonable and necessary and a lower level service would have been reasonable and necessary, an incorrect code was submitted for the service that caused a higher payment to be made, or a Medicare payment rule was not properly applied (such as failure to reduce the payments for multiple surgery cases).  The RAC must determine the level of service that was reasonable and necessary, or determine the correct code that represents the service described in the medical record.  In these cases, the overpayment amount is the difference between the amount actually paid and the amount that should have been paid.

22.     After a RAC identifies an improper payment, CMS (through another contractor known as a MAC) sends the provider a demand letter, typically referred to as a "recoupment letter", which in the case of an overpayment requests repayment to CMS in a

specific amount. The recoupment letter also contains the rationale provided by the RAC for denying relevant claims and educates providers about how to avoid similar payment errors in future Medicare billing practices. CMS's recoupment of an overpayment typically commences within 41 days of the recoupment letter, and receipt of repayments is processed through the MACs.

23.    There is a five-level appeals process available to a provider if the provider disagrees with a RAC's determination that the provider received an overpayment from CMS.

24.    Each RAC is responsible for timely uploading to an online Recovery Audit Data Warehouse maintained by CMS the data concerning identified improper payments and the demands to providers for refunds of overpayments identified by the RAC. The RAC is required to upload the information within two business days of the reportable event. For example, when the RAC identifies improper payments to a provider, the RAC must upload the relevant information within two business days of that identification.

**B. Payment of Contingency Fees to the RACs by CMS.**

25.    CMS compensates the RACs for their services on a contingency fee basis. The contingency fee is (i) a percentage of the overpayments that are identified and reach a certain stage in the process of collecting the overpayment from the provider, and (ii) a percentage of the underpayments that are identified, without netting them against overpayments. The base contingency fees vary from RAC to RAC and range from 10.4 percent to 14.4 percent for all claim types, except for claims relating to payments for durable

medical equipment (DME).  The contingency fees for DME claims range from 15.4 percent to 18.9 percent.

26.     The RAC sends CMS an invoice for its contingency fees monthly based on the data regarding improper payments and the demands to providers for return of overpayments that the RAC has entered into the Data Warehouse.

27.     For an overpayment determination made by a RAC and appealed by the provider, previous CMS policy was to allow the RAC to receive its contingency fee immediately after the RAC denied the claim and the claim was deemed to have been recouped, despite the pendency of the appeal.  However, effective October 31, 2016, CMS revised its policy to provide that a RAC would not receive a contingency fee unless and until (a) the provider has not filed a valid timely appeal of the determination of the overpayment, or (b) the provider filed a timely appeal and the appeal has received an unfavorable decision through the second state of the appeals process.

28.     If a provider's appeal of an overpayment determination is adjudicated in the provider's favor at any stage of the appeals process, the RAC is required to repay CMS for any contingency fee that it received for that supposed overpayment.

29.     Sometimes after a provider has been notified of, and required to repay, overpayments of a certain type, the provider may voluntarily identify and repay to CMS similar types of overpayments for which it has not yet received a recoupment.  In those cases, the RAC is not entitled to a contingency fee on those particular overpayments.

30.     A RAC is not allowed to demand repayment from a provider for any overpayment that is less than $25, and in most cases, individual overpayments of less than

$25 dollars cannot be aggregated to overcome this limitation.  If a RAC pursues adjustment on a claim less than $25, the RAC is not allowed to receive a contingency fee on any of the amounts recouped.

31.     If a RAC does not meet its obligation to timely upload overpayment information or related updates to the Data Warehouse within two business days of the event, the RAC's  contingency fee with respect to the affected improper payments must be reduced by 25%.

32.     CMS reserves the right to enter into compromises or settlements with providers with respect to improper payments.  For example, if a particular group of providers, such as a group of hospitals, has received recoupment letters demanding repayment of an aggregate of $100 million, CMS has the authority to enter into a settlement agreement with the providers under which they would receive a partial payment or discounted payment of, for example, $60 million.  If CMS determines that a compromise and/or settlement is in the best interest of Medicare, the RACs who identified the subject claims are entitled to a contingency fee based only on the amounts actually recovered in the settlement, and not based on the amounts originally demanded in the recoupment letters.

33.     Based on CMS annual reports to Congress for the Recovery Audit Program, the table below indicates the total amounts of overpayments collected, underpayments restored, and total contingency fees paid to RACs in the Recovery Audit Program for fiscal years 2013 through 2018, the years for which such information is publicly available. Obviously, contingency fees are big money for the RACs, amounting to $656,540,000 –

nearly three quarters of a billion dollars – over only six years of the program and not even

counting the contingency fees paid in the last two fiscal years or fiscal 2021 to date.

| Fiscal Year | Overpayments Collected* | Underpayments Restored* | Contingency Fees Paid to RACs** |
|---|---|---|---|
| 2013 | $3,650,914,625 | $102,408,504 | $301,700,000 |
| 2014 | $2,394,846,151 | $173,096,904 | $274,600,000 |
| 2015 | $359,729,012 | $80,964,652 | $20,250,000 |
| 2016 | $404,463,430 | $69,459,535 | $39,120,000 |
| 2017 | $24,329,272 | $6,744,524 | $10,950,000 |
| 2018 | $72,029,939 | $7,670,863 | $9,920,000 |
| **TOTAL CONTINGENCY FEES** | | | **$656,540,000** |

*Figures are rounded to nearest dollar.
**Figures are rounded to nearest ten thousand dollars.

34.     In fact, tens of millions of dollars in these contingency fees collected by each

of the Defendants during these years and to the present time (with the exception of CGI,

whose contract with CMS ended in 2018) were unearned contingency fees.  As described

below, these fees were unearned due to the Defendants knowingly and wrongfully:

collecting and failing to return contingency fees for the full amount of claims that were

denied only in part; collecting and failing to return contingency fees that were subject to the

appeals process; misusing extrapolation to deny many claims that should not have been

denied and collecting and failing to return contingency fees on them; collecting and failing

to return contingency fees on overpayments voluntarily repaid by providers before receiving

recoupment letters; and collecting and failing to return contingency fees for denied claims of

less than $25.

35.     Defendants have not returned these unearned contingency fees to the

Government, in violation of the FCA.  Further, Defendants knowingly retained and failed to

return to the Government, in violation of the FCA, an aggregate of $68 million of unearned contingency fees that were demanded by CMS to be returned following a settlement concerning the denied claims of certain providers.  Moreover, defendants coordinated their activities by which they collected and failed to return unearned contingency fees, thereby engaging in a conspiracy to violate the FCA.  These violations of the FCA have amounted to theft of the monies that should have been in the Medicare Trust Funds, which are funded by working and retired Americans.  These funds should have been used for treatment of elderly and the disabled American, not for lining the pockets of corporate manipulators of the system.  Furthermore, Defendants' violations of the FCA have contributed to the looming insolvency of the Medicare Hospital Insurance Trust Fund.

### C. The False Claims Act.

36.     In relevant part, the FCA at 31 U.S.C. § 3729(a)(1)(G) establishes treble damages liability to the United States for any individual or entity that:

> knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Government.

The liability to the United States under this particular prong of the FCA, known as a "reverse false claim," results not from improper payment by the Government to the defendant, but instead results in no payment to the Government when a payment is obligated.  *Hicks v. D.C.*, 183 F. Supp. 3d 159, 160–61 (D.D.C. 2016).  Thus, the elements of a violation constituting a reverse false claim under this portion of the FCA are that the defendant (1) concealed or improperly avoided or decreased an obligation to pay the government, and (2) did so knowingly. *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,* 839 F.3d 242, 255 (3d Cir. 2016) (citing 31 U.S.C. § 3729(a)(1)(G)) ("mere knowledge and avoidance of an obligation is

sufficient"); *accord United States v. Vandewater Int'l, Inc.,* No. 2:17-cv-04393RGK-KS, 2019 WL 6917927, at *4 n.1 (C.D. Cal. Sept. 3, 2019).  There is no requirement to show that the defendant used a false record or statement or that a record or statement was material. *Victaulic,* 839 F.3d at 255; *Vandewater,* 2019 WL 6917927, at *4 n.1.408; *United States ex rel. Ormsby v. Sutter Health,* 444 F. Supp. 3d 1010, 1056 (N.D. Cal. 2020).

37.     Defendants' wrongful retention of unearned contingency fees violated their contracts with CMS and CMS's Statement of Work for the Recovery Audit Program.  Under their contracts and the Statement of Work, Defendants had an obligation to refund timely to the Government any unearned contingency fees that they collected and held.

38.     Moreover, Congress, as part of the Patient Protection and Affordable Care Act in 2010, promulgated "Enhanced Medicare and Medicaid Program Integrity Provisions," including provisions codified at 42 U.S.C. § 1320a-7k. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402, 124 Stat. 119, 753–56 (2010). Section 1320a-7k provides that a person who has received a Medicare or Medicaid overpayment must report and return the overpayment within 60 days after the overpayment is identified. 42 U.S.C. § 1320a-7k(d)(2)(A). Any overpayment retained for more than 60 days becomes an "obligation" for purposes of the reverse-FCA provision. 42 U.S.C. § 1320a-7k(d)(3). *See Ormsby,* 444 F. Supp. 3d 1010 at 1056.

39.     Under the FCA, the terms "knowing" and "knowingly" mean that a person (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A)(i),(ii),(iii)).  In defining "knowing" and

"knowingly" to include reckless disregard, and deliberate ignorance, Congress has greatly expanded common dictionary definitions of those terms, and specific intent to defraud is not required. *Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 385 (S.D.N.Y. 2015).

40.     Further, among the instances in which courts have found FCA defendants liable for reckless disregard is when they have failed to familiarize themselves with applicable statutes or regulations in the Medicaid and Medicare programs. *See, e.g., United States v. Mackby*, 261 F.3d 821, 828 (9th Cir.2001) (participants in the Medicare program have a duty to familiarize themselves with the legal requirements for payment; failure to do so amounts to reckless disregard or deliberate ignorance of those requirements). *See also U.S. ex rel. Drescher v. Highmark, Inc.,* 305 F. Supp. 2d 451, 458 (E.D. Pa. 2004) (failure to incorporate in its processing systems information necessary for defendant's Medicare claims processing to comply with applicable regulations amounted to knowledge).

41.     Defendants are large and sophisticated companies that touted themselves as having expertise in medical industry recovery audit services, and they were or should have been aware of the requirements of the Statement of Work and their contracts with CMS for the Recovery Audit Program.  Defendants' wrongful collection of unearned contingency fees and refusal to repay them to the Government at best constitutes reckless disregard and deliberate ignorance of their obligations, but Relator alleges that it was willful.   Defendants clearly acted knowingly in improperly avoiding or decreasing their obligations to transmit unearned contingency fees to the Government.

42.     In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.

FALSE CLAIMS ACT COMPLAINT – Page 13 OF 24
*FILED UNDER SEAL*

**FACTUAL ALLEGATIONS**

43.     Upon information and belief, the Recovery Audit Program was CMS's first foray into paying vendors on a contingency fee basis.  CMS was originally reticent to compensate RACs in this manner, out of concern for possible abuses of such a compensation scheme by the RACs and the ensuring potential for the RACs to be overcompensated for their services at the expense of the Medicare Trust Funds.  Unfortunately, CMS's concerns proved to be all too prescient.  Throughout the course of his employment with HMS, Relator became aware of a number of different ways in which HMS knowingly collected unearned contingency fees from CMS and failed to repay them to CMS.  Relator alleges that these wrongful activities on the part of HMS began with the nationwide launch of the Recovery Audit Program in 2011 and continue through the present day.  Further, as described below, upon information and belief, including based on the numerous ways that the RACs have coordinated their activities and various actions with respect to CMS, Relator alleges that all the other Defendants also have engaged in these wrongful practices.

44.     As described above, there are various instances in which a RAC determines that a Medicare claim paid to a provider should be denied in part rather than in full.  In these cases, the overpayment amount is the difference between the amount actually paid to the provider and the amount that should have been paid.  For such overpayments that are collected from the provider, the RAC's contingency fee should be based on this difference.  For example, if $1,000 is the amount actually paid to the provider, and $600 is the amount that should have been paid, then the overpayment amount is the difference between $1000

and $600, or $400.  The RAC's contingency fee is specified to be a percentage of that difference, i.e., a percentage of $400 and not of $1,000.

45.     However, it came to Relator's attention that in these circumstances Defendants on a frequent and regular basis invoiced CMS for a contingency fee based on the full amount that was originally paid to the provider, contrary to the Statement of Work and the provisions of their contracts with CMS.  In other words, using the hypothetical numerical example above, Defendants calculated and invoiced to CMS a contingency fee based on the applicable percentage of $1,000 rather than of $400.

46.     From an operational standpoint the provider, rather than simply repaying the difference to CMS for a partially denied claim, is required first to repay the full amount that it received, but then a new claim is entered and the provider is paid by CMS the lower amount that should have been paid.  In other words, again using the numbers from the hypothetical example above, the provider refunds the full $1,000 and then is paid the $600 in a separate transaction.  However, the separation of the transactions in this manner – as well as the complexity of the math involved, and the vast amount of data to be reviewed, for actual claims – enabled Defendants to game the system and inaccurately invoice an unwitting CMS for a contingency fee on the $1,000 amount, never taking into account the $600 that was paid to the provider.  In this manner, Defendants have knowingly invoiced and collected from CMS unearned contingency fees and has not refunded them to CMS despite knowing that these fees were unearned.

47.     As described above, sometimes after a provider has received a recoupment letter for and been required to repay overpayments of a certain type, the provider may

voluntarily identify and repay to CMS similar types of overpayments for which it has not yet received a recoupment letter.  In those cases, the RAC is not entitled to a contingency fee on those particular overpayments.  However, upon Relator's information and belief, Defendants on a frequent and regular basis have invoiced CMS for contingency fees based on these overpayments voluntarily returned to CMS by the provider before receiving a recoupment letter, contrary to the requirements of the Statement of Work and Defendants' contracts with CMS.  It takes some time for the MAC to process these voluntary refunds from providers, and by the time the processing has completed, Defendants have wrongfully claimed credit for recouping them.

48.     It will be easy to confirm this allegation by observing the dates that the providers voluntarily refunded these overpayments to CMS and then ascertaining whether the provider had received a recoupment letter for these particular overpayments prior to the date of refund.  By invoicing CMS for contingency fees on these types of overpayments, Defendants have knowingly collected unearned contingency fees from CMS and has not refunded them to CMS despite knowing that these fees were unearned.

49.     Defendants also wrongfully collected and retained contingency fees by taking advantage of the system by which providers can appeal claims denied by the RACs.   Prior to the change in CMS rules that do not allow a RAC to collect a contingency fee for an appealed denial until it has passed the second level of appeal with a decision against the provider, the RACs routinely invoiced CMS for and collected contingency fees for these denials early in the appeals process.  To encourage CMS to allow this practice, the RACs agreed to establish reserves that would ostensibly be used to repay contingency fees on cases

that were later resolved in the provider's favor during the appeals process. However, the RACs' estimated liability for such appeals was low in light of the actual appeals overturn rate in providers' favor, which approached 70%.

50.     Even after the October 31, 2016 CMS rule change requiring that contingency fees could not be collected before a case passed through the second level of appeal without a ruling in the provider's favor, the RACs continued collecting contingency fees from CMS earlier in the process, and worked together to convince CMS that even though this was not in accordance with CMS rules or their contracts, the RACs needed to continue this practice in order to meet their respective quarterly financial targets and pay their own bills and staff salaries.

51.     However, Defendants took advantage of the large number of appeals overwhelming the system and knowingly failed to repay contingency fees to CMS on thousands of appeals that were ultimately resolved in the providers' favor. The RACs continued to hold onto the reserves they had set aside for refunding contingency fees in these circumstances, and once their initial contracts with CMS expired in 2018, took the position that they no longer had any obligation to return contingency fees for cases decided in the providers' favor on appeal, and began booking the amounts in these reserves to income.

52.     Defendants also collected unearned contingency fees by misusing the extrapolation process. Extrapolation entails a RAC taking a sample of a certain type of claims submitted by a particular provider, determining an error rate among those claims (such as, for example, 20%) and then using that rate to deny 20% of all those types of claims

submitted by the provider. Extrapolation is permitted in the Statement of Work and Defendants' contracts with CMS, particularly when the provider historically has a high error rate for those types of claims. However, Defendants abused the extrapolation process by using it to deny a higher percentage of a provider's particular type of claims than the error rate, in many cases denying all of that type of claims. In many cases, the medical record related to a claim simply might be missing support for the particular DRG or payment level that was claimed. However, the medical record and what is documented depends mostly on the particular doctor(s) rendering the treatment and the related staff. It cannot be assumed that each and every one of the varying doctors and staff connected to claims of a particular type are going to fail to correctly document the services rendered. Yet the Defendants treated all such claims as being incorrectly documented. This wrongful practice of the Defendants led to providers being overwhelmed with large numbers of claim denials that the providers did not always have the time and resources to appeal, and thus enabled Defendants to collect contingency fees on thousands of claims that should not have been denied. Despite Defendants' knowledge that these contingency fees were unearned, they knowingly retained them and did not return them to the Government.

53.     As noted above, the Statement of Work and CMS's contracts with Defendants generally do not permit a RAC to collect a contingency fee on an overpayment that is less than $25. However, Defendants frequently sent providers recoupment letters for these small overpayments and invoiced and collected from CMS contingency fees for them. Despite Defendants' knowledge that these contingency fees were unearned, they knowingly retained them and did not return them to the Government.

54.     A number of factors facilitated the Defendants' ability to collect and fail to return unearned contingency fees in the scenarios described above, including: the fact that overstretched and inexperienced CMS staff members often did not understand the terms of CMS's contracts with the Defendants, while the RACs had the resources and depth of personnel to develop a superior knowledge of the system; the Defendants' proclivity for sending voluminous data requests, recoupment letters and other notices to providers, leaving providers overwhelmed and CMS unable to quality-check the RACs' claims denials before having to pay the RACs' invoices for contingency fees; the shortcomings of CMS's technology and information systems; the fact that there was little competition for the RACs' services and CMS was forced to renew its contracts in 2018 with most of the RACs (other than PGI), with little leverage to strictly enforce the terms of the contracts and the Statement of Work; Defendants' heavy use of lobbyists to pressure CMS into taking policy positions or actions unduly favorable to the RACs at the expense of providers; and the ever increasing dominance of HMS and Cotiviti over the Recovery Audit Program, which has only been exacerbated by the recent sale of HMS that transferred its RAC business to Cotiviti and solidified Cotiviti's control of three of the country's four RAC regions.

55.     Defendants also knowingly retained and refused to refund to CMS millions of dollars worth of unearned contingency fees relating to a settlement between CMS and certain hospital providers.  In September 2014, CMS announced that it had reached a settlement with a number of acute care hospitals and critical access hospitals that were in dispute with CMS over the volume of their denied claims and that had numerous appeals of denied claims pending.  In the settlement CMS agreed to let the hospitals keep 68% of the

total amounts of these claims if they were willing to resolve or drop their appeals.  This meant that 32% of the amounts originally paid to providers would be deemed denied.

56.     Consequently, in June 2015 CMS sent demand letters to each of the RACs, which explained that the RACs were entitled to contingency fees only on the claims deemed denied, i.e. 32% of the claims subject to the settlement.   Because each of the Defendants had collected contingency fees on the full amount of these claims,  68% of the contingency fees collected were unearned.  Accordingly, in its demand letters, CMS demanded repayment of the following from each of the Defendants:  $28,603,384.86 from HMS (previously HDI);  $22,308,058.51from Cotiviti (previously Connally); $5,258,448.97 from Performant; and $11,672,876.24 from CGI, for a total from all the Defendants of over $68 million.

57.     None of the Defendants has ever repaid any of these amounts.  Although at least some of the Defendants initially established reserves for potential repayment of these amounts, the Defendants coordinated their approaches by failing to respond to CMS's demands, and then taking the position – without any legal merit and similarly to how they approached the reserves established for appeals discussed above – that once the terms of their original contracts expired in 2018, they were no longer obligated to return these unearned contingency fees, and the Defendants that had previously established reserves for these amounts began to book them to income.

58.     Defendants' wrongful retention of and refusal to repay unearned contingency fees that had been demanded by the Government not only was a violation of the FCA in and of itself; but it also underscored how Defendants have coordinated their activities and

approaches in order to collect unearned contingency fees and not repay them to the Government.

59.     Among the other factors providing a reasonable basis for Relator's information and belief that Defendants have coordinated their efforts to collect and not return unearned contingency fees is the fact that in this industry, all the senior executives of the RACs know one another.  These executives know which companies they could potentially buy and which companies could potentially buy them.  This knowledge and interaction allows for consolidation, leveraging of technology, enhanced profitability/market share and frequently a lucrative exit strategy for the executive team.  Upon information and belief, the previous CEO of HMS, Bill Lucia, had been looking for a buyer for HMS for a number of years, which led to numerous discussions and interactions with other players in the industry.  The acquisition of HMS by Veritas Capital (through Gainwell Technologies) cemented the coordination and internal communications that HMS had with Cotiviti, which became its affiliate as a result of the transaction.

60.     Relator's information and belief concerning Defendants' coordination of their actions also is supported by the manner in which Defendants imitated one another in the trends of claims that they denied.  When one RAC would see that one of the other RACs had success denying a large number of provider claims of a certain type, it would follow suit and deny large numbers of similar types of claims in its region.  For example, if one RAC denied a plethora of claims in its region relating to a patient receiving multiple surgeries on the same day and the provider incorrectly coding the services which resulted in an overpayment, the other RACs would begin searching for and denying similar claims in their regions.

Relator believes that the Defendants shared information and experiences with one another in these efforts. Although there may be nothing improper about this activity in and of itself, it underscores how the Defendants worked together to maximize their contingency fees, which in other cases described above were unearned.

61.      The commonality of Defendants' practices concerning their misuse of the appeals system and extrapolation techniques to collect and not return unearned contingency fees also support Relator's information and belief that they coordinated and in fact conspired to improperly invoice and retain unearned contingency fees.

## <u>COUNT 1</u>

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:**
**WRONGFUL RETENTION OF UNEARNED CONTINGENCY FEES –**
**AVOIDING OR DECREASING OBLIGATIONS**
**TO TRANSMIT MONEY TO THE GOVERNMENT**
**31 U.S.C. § 3729(a)(1)(G)**

62.      Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

63.      Relator seeks relief against Defendants under Section 3729(a)(1)(G) of the FCA, 31 U.S.C. § 3729(a)(1)(G).  Defendants knowingly and wrongfully: collected contingency fees for the full amount of claims that were denied only in part; collected contingency fees for claims that were subject to the appeals process; misused extrapolation to deny many claims that should not have been denied, and collected contingency fees on them; and charged contingency fees for denied claims of less than $25.  In each case Defendants knew the extent to which these contingency fees were unearned, and yet intentionally refrained from returning any of them to the Government.  Further, Defendants knowingly retained and failed to return to the Government an aggregate of $68 million of

FALSE CLAIMS ACT COMPLAINT – Page 22 OF 24
*FILED UNDER SEAL*

unearned contingency fees that were demanded by CMS to be returned following a settlement regarding the denied claims of acute care hospitals and critical access hospitals.

64.     Accordingly, Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

65.     By reason of Defendants' knowing and wrongful actions in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

## COUNT 2

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:
### CONSPIRING TO VIOLATE THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)

66.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

67.     Relator seeks relief against Defendant under Section 3729(a)(1)(C) of the FCA, 31 U.S.C. § 3729(a)(1)(C).

68.     Accordingly, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(G), in violation of 31 U.S.C. § 3729(a)(1)(C).

69.     By reason of the Defendants' conspiracy to violate 31 U.S.C. §§3729(a)(1)(G), the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against Defendants as follows:

(a)      treble the Government's damages in an amount determined at trial, plus the maximum statutorily-allowed penalty for each false claim submitted in violation of the FCA or State statute set forth above;

(b)      an award of costs and the maximum Relator award allowed pursuant to the FCA and State statutes set forth above; and

(c)      such further relief as is proper.


Dated:  June 17, 2021                              Respectfully submitted,


                                                   */s/ T. Alan Harris*
                                                   T. Alan Harris
                                                   alan.harris@harrislawusa.com
                                                   HARRIS LAW FIRM PC
                                                   7500 Rialto Blvd Bldg 1, Suite 260
                                                   Austin, TX 78735
                                                   512-732-7377
                                                   Fax: 877-876-8913

                                                   ***ATTORNEYS FOR RELATOR***

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

The undersigned counsel of record certifies that the following listed persons and entities

have an interest in the outcome of this case.

*Plaintiffs:*
> Christopher Frey
> United States of America

*Counsel:*
> *Relator*
> > T. Alan Harris

| *Defendants (including corporate parents):* |
|---|
| Health Management Systems, Inc. |
| Cotiviti, Inc. |
| Gainwell Technologies, LLC |
| Veritas Capital |
| Performant Recovery, Inc. |
| CGI Technologies and Solutions, Inc. |
| CGI Inc. |

*/s/ T. Alan Harris*
T. Alan Harris
Counsel for Relator

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Complaint has been served by United States mail to the following parties on June 17, 2021:

| | |
|---|---|
| United States Attorney General | Honorable Merrick Garland<br>Attorney General of the United States<br>950 Pennsylvania Ave. NW, Room 4545<br>Washington, D.C. 20530-0001 |
| Acting United States Attorney | Jennifer Lowery<br>Acting U.S. Attorney for the Southern<br>District of Texas<br>1000 Louisiana, Ste. 2300<br>Houston, TX 77002 |

*/s/ T. Alan Harris*
T. Alan Harris
Counsel for Relator